HORACE STRICKLAND AND OTHERS *v.* GEORGE W. PRICHARD AND OTHERS.

[IN CHANCERY.]

*Associations. Free Masons.*

" The Mount Lebanon Royal Arch Chapter " of Free Masons, in 1836, disposed of all their real and personal property, consisting of their hall, furniture and equipment, pursuant to a vote of the Chapter, and for twenty-three years held no meetings, elected no officers, performed no acts required by its laws and rules, and ceased to have any visible sign of existence. *Held,* that the legal existence of the Chapter was gone, and that it was beyond the power of the State Chapter to restore it to life so as to preserve for it a continued existence from 1836.

A rule of the association that officers elected should hold their offices till others were elected, could not operate in a case of this kind to preserve its legal existence.

APPEAL from the court of chancery, Orange County, January Term, 1863, PECK, Chancellor. The substance of the bill, and the material facts in the case are sufficiently detailed in the opinion of the court.

*Peck & Colby,* for the defendants.

*Paul Dillingham, A. M. Dickey* and *C. W. Clarke,* for the orators.

POLAND, Ch. J. The orators are the members of and constitute the ·" Mount Lebanon Royal Arch Chapter number thirteen," a masonic body or fraternity located at Bradford. They seek to recover by this suit a fund of between four and five hundred dollars from the trustees of the Bradford Academy.

From 1815 to 1836 there was an association or society of Freemasons located at Bradford, called the " Mount Lebanon Royal Arch Chapter number seven," composed of persons living in Bradford and vicinity.

On the 23d of February, 1836, this chapter voted to dispose of the real and personal property belonging to it, being their Masonic hall and the furniture and equipment of the order. On the 14th day of June, 1836, the chapter voted "that $150. of the avails of the funds of the lodge and said property be placed in the hands of the trustees of Thetford Academy, the interest of which to be appropriated by them for the benefit of said Academy, and the principal to be returned by said trustees when called for by this institution, and the remainder

to be placed in the hands of the trustees of Bradford Academy in like manner. Under this vote the sum before mentioned went into the hands of the trustees of Bradford Academy, the interest of which has been appropriated by them to the use of their institution, and the principal they have refused to pay over on the call of the orators. After the meeting of June 14th, 1836, at which said vote was passed, no meetings were held by said chapter, and no action had as an association or society, until the year 1859. At the annual session of the State Royal Arch Chapter in August, 1859, a petition was presented from certain persons who were members of said Mount Lebanon Chapter, praying for a renewal of their charter. This petition was referred to a committee who reported in favor of granting a renewal of said charter, upon payment of the regular fees for a new charter, and the report of the committee was adopted. Subsequently however at the same meeting this vote was rescinded, as it appeared to conflict with a general regulation adopted in 1850.

It is a matter of general history, as well as of proof in this case, that there was a general suspension of the exercise of their usual functions by all Masonic bodies in this state for many years succeeding the political excitement upon that subject, and the legislation adverse to masonry, which grew out of it. The State Royal Arch Chapter held no meetings from 1834 to 1849. In 1849 the State Royal Arch Chapter was reorganized, but it seems to have been doubted whether it really possessed legal vitality in itself, and it appears to have been done under a dispensation obtained from the Grand Royal Arch Chapter of the United States. In 1850 a set of general regulations were adopted applicable to the state of things existing after this long Masonic interregnum. One of these general regulations provided that subordinate chapters, theretofore chartered, should be entitled to have the same renewed on petition, by making application therefor at any time prior to the annual meeting in 1853. The Mount Lebanon Chapter had failed to comply within the time and for six years after. To avoid this difficulty it was proposed to amend the general rule so as to admit the granting a renewal to Mount Lebanon Chapter, but for no other purpose, and it was so done.

The avowed purpose in the petition for renewal and in the proceedings had upon it, was to keep up such a legal successorship as would enable the revived institution to recall the money parted with under said vote. Under this vote a new charter was issued to the Mount Lebanon Royal Arch Chapter number thirteen, and upon its face is wholly a new and original charter. Upon it however is endorsed a certificate by the Grand Secretary, that the charter is issued as a renewal of their original charter which is lost. The first meeting of the Mount Lebanon Chapter under this new or renewed charter was in 1860, and since that time several new members have been added to the chapter, who are also orators in this bill. The defendants resist a decree in favor of the orators for the repayment of this money, upon two grounds. First, that the institution of Freemasonry, (of which order or fraternity, the orators are an associated body in their Masonic character,) and its objects, practices and organizations are repugnant to, and contrary to the public policy and legislation of this state, and that therefore the court should not lend their aid to enable them to recover a sum of money to be applied to the uses and purposes of the organization.

Secondly, that the orators are not the same association or chapter who were the original owners of this money and parted with it to the defendants; that the original association was by its own acts, and the long cessation of any action required by its own laws and rules, actually dissolved and destroyed, and that the existing chapter though composed in part of the same members, and bearing the same name, is in reality a new organization, and has no legal title to succeed to, or claim the rights belonging to the first.

We do not find it necessary to decide the question raised by this first named ground of defence. It is a matter of public history that there was a period of some years, in this state, when among its citizens there was a very general distrust of, and hostility to the institution of Freemasonry, and this sentiment became the leading element of the dominant political party in the state. During the ascendency of this party, all the Masonic charters which had ever been granted by the legislature of this state were repealed, and a law was passed prohibiting the administration of extra judicial oaths. It was supposed by the party then in political power in the state, that they had

Strickland et al. *v.* Prichard et al.

effectually destroyed the institution in this state, and for many years it ceased to have any apparent vitality. Whether the institution deserved all or any of the censure and unpopularity which it then suffered, we have now but insufficient means of knowing, and perhaps it would hardly be just to accept the legislative indications of those few years as establishing a general legal policy upon the subject.

The second objection we consider fatal to the right of the orators to the relief sought.

The orators claim to recover as an *association* or *society*, and not in their individual and personal rights. Many of the orators have but recently become members of the chapter, but they claim to be equally entitled with the others, because the right is that of the association. The orators not being a chartered corporation are obliged *to sue in their own names instead of their corporate or charter name,* but in substance they claim to act and have rights, in their associated character ; that they are themselves, and their rights are of a *quasi* corporate character.

This brings us to the precise point in dispute ; has the original Mount Lebanon Chapter been in continual existence to the present time ; or was it in fact dissolved, and did it cease to have legal existence as an association or society? If it really ceased to exist, and became dissolved, it is not claimed that any new association, composed in part, or even of all the same members, and formed for the accomplishment of the same general purpose, can legally succeed to their rights or property. The rules and laws of the society provided for constant action by itself; it was required to make annual elections of its officers, and to hold meetings once in two months. For more than twenty-three years no meeting of the chapter was held for any purpose, and no officers were elected ; it had no place of meeting, it was without property or effects, and was without visible sign of existence. Now if such a society or association, can be ended or dissolved by ceasing to act, and perform its ordinary functions and duties, provided for by its own laws and rules, it seems to us this one became so. For a period of time much longer than is required for any legal prescription in this state, or for the loss of any right by abandonment, or *non user*, this society was without sign of life or existence. That such an association might become dissolved

by an entire failure to act as such for a sufficient length of time, was not denied in the argument, and could not be successfully. If the time in the present case was not enough, we can hardly imagine what would be sufficient.

But it is said that although the rules of the society required annual elections of officers, they also provided that the officers elected should hold their offices till others were elected, and that this society was therefore in existence because it had officers duly elected and living. But the question of dissolution by lapse of time, could hardly be seriously affected by the existence of officers who did no acts and performed no duties as such.

But this provision for officers holding till others were elected, was evidently for the mere purpose of saving the regular existence of the association in case of accidental failure to elect at the required time, and it never was in fact, and never was intended, to be relied on as a provision for immortality, for any period of time after the association should in fact cease to exist.

It is claimed too that the several members of the chapter when they voted to sell their building, which was their place of meeting and deposit of their records and furniture, and also their clothing and equipment, and thereby disabled themselves from performing the various duties and ceremonies devolving on them as members of the order, intended not to disband or dissolve their society, but to keep that in life, ready to resume labor at any moment when public sentiment should seem more favorable to the order.

It is not perhaps very material to enquire what views any individual member of the society might entertain on that subject. It is undoubtedly true that many of the members of this chapter and others were warmly attached to the institution, and had some indefinite hope, that it would some day revive and flourish again, while others less devoted felt no such anxiety. But we cannot believe that any of the members of this chapter, at the time of the vote alluded to, had any serious intent or expectation of keeping their organization on foot, with a view to again set it in motion. At that time it was the general belief that the order would never again be revived in the state. The state organizations had ceased to act; charters granted to any masonic institutions by this state were repealed ; the

Strickland et al. *v.* Prichard et al.

right to administer oaths to members, which had before that time been universally used, was prohibited.

Under these circumstances it would be almost singular that the members of this chapter should have designed to have kept up their organization and existence.

Their acts seem to be much more in accordance with a design to disband and dissolve than to preserve and maintain their society organization. They by sale of their building and the furniture and clothing of their order, disabled themselves from performing the functions of their order, and abandoned all attempt to keep up their organization by the election of officers, holding meetings, or performing any duties enjoined by the code of the institution, and this state of non-existence continued for the period of twenty-three years. Even after the revival of the institution in the state and a regulation adopted for the reorganization of subordinate chapters, this one allowed years to elapse without conforming to it, or asking to be reinstated. The course of proceeding adopted for the purpose of renewing this chapter in the state chapter, seems to evince a painful consciousness that the attempt was that of restoring the dead to life.

We have no occasion to doubt but that the course adopted was sufficient to create the orators a valid subordinate chapter, but we are satisfied that the legal existence of the old Mount Lebanon Chapter was already gone, and that it was beyond the power of the state chapter to restore it to life so as to preserve for it a continued existence from 1836.

The decree of the chancellor is therefore reversed, and the case remanded with directions to dismiss the orators' bill with costs to the defendants.